## ABEL *v.* DELAWARE & H. CANAL CO.

*(Supreme Court, General Term, Third Department. May 26, 1890.)* .

MASTER AND SERVANT—RULES TO PROTECT SERVANT—INSTRUCTIONS.

In an action for causing the death of plaintiff's testator, while performing his duties as car-repairer, by the absence of the red flag which defendant's rules required to be placed at the end of cars undergoing repairs, the court submitted to the jury the question whether a red flag thus posted was a reasonably safe protection, and, after referring to the rules of other companies for protection of car-repairers, and adding that it was not the duty of defendant to adopt such rules, the court told the jury they had a right to consider "whether some rule which occurs to you, even though no company had adopted it, would have been a better rule, and given better protection, and such a one that ought to have been adopted and maintained." *Held,* that the charge did not, in effect, tell the jury that, if they could think of some better rule, then they could find defendant negligent for not adopting it.

Appeal from circuit court, Saratoga county.

Action by Agnes E. Abel, as executrix, etc., against the Delaware & Hudson Canal Company to recover for the death of her testator while in the employ of defendants. There was verdict and judgment for plaintiff, and defendant appeals. For former report, see 9 N. E. Rep. 325.

Argued before LEARNED, P. J., and LANDON and MAYHAM, JJ.

*Edwin Young,* for appellant. *N. C. Moak* and *L'Amoreaux & Dake,* for respondent.

LEARNED, P. J. The plaintiff's testator was a repairer of cars, working in the yard of the defendant at Mechanicsville. He was repairing one of several cars on what is called the "cripple" track, that is, the track where cars out of order are placed, and in doing this he was between two cars. While he was there, other cars were backed in, or "kicked in," on the cripple track. Some one called out: "Look out; they are backing in there." The deceased attempted to get from between the cars, but did not succeed. He was caught and killed. Cowen was the foreman of the car-repairers, and employed the men. He told every man that was working to work under the protection of a red flag. He directed the two men who worked at the north end of the cars, and the two who worked at the south end, to take care of protecting the red flag, and not to go to work until the red flag was put in position at the draw-head of the car. He also stated to Donnelly, the yard-master of that yard, and to all the brakemen there, that the car-repairers would work under the protection of a red flag. Donnelly, the yard-master, who had charge of moving the cars, told the brakeman not to move the cars unless the red flag was down. If there was a flag, then he understood that some one was at work on the cars; if not, then that nobody was there. When the red flag was there, he understood that the cars must not be meddled with; and he so told his men. The car-repairers worked in sets of two, Hickey and

Patrick at the north end; and, as above stated, it was their business to take care of protecting the red flag at that end. On the day of the accident, and about one hour and a half or two hours before it, Hickey put the flag in the draw-head, and left it there. He did not know of any one's taking it out. If he had found it out, it would have been his business to place it back. About half an hour before the accident, Donnelly says that the flag was not in its place, but was lying on the ground. He called the attention of one of the repairers to this fact, because he knew there was danger unless the men were notified. The man picked up the flag, and said he would put it up. He was about 20 feet from the north end of the cars, where the flag should have been placed. It was evidently the duty of this man to put the flag in its place at the north end. Had he done so, there is no reason to think that the accident would have happened, for the general rules of the company provide: "A red flag by day, and a red lantern by night, are signals of danger, on perceiving which the train must be brought to a full stop as soon as possible, and not proceed until it can be done with safety." These rules were known to Donnelly, the yard-master, who had control of the movement of the cars on this cripple track, and he had told his men that when the red flag was maintained they must keep away from the cars. It seems, then, evident that the accident occurred through the fact that the flag had by some one been taken out of its place, and by the neglect of the train-repairer to put it back when his attention was called to the matter by Donnelly. It appears by the testimony of witnesses that the Boston, N. Y. & W. R. Co. uses a red flag to protect repairers on a cripple track; and their master builder testifies that the red flag is always understood as a signal of danger, and that in his opinion it is the best signal for the protection of repairers. A rule of the company substantially like that given above is the rule for such protection. The same testimony is given as to the practice of the Boston & Albany Railroad Company up to 1885, since which time the company has used a yellow flag. The rules of the New York Central & Hudson River Railroad Company say that a blue flag placed in the draw-head at the end of a train of cars standing on the main track or siding denotes that repairers are at work beneath, and that such car must not be coupled or removed until the flag is removed by the repairers.

On the former trial of this case the plaintiff was nonsuited. The judgment was reversed by the court of appeals. 103 N. Y. 581, 9 N. E. Rep. 325. In the opinion of the court it is remarked that the rule that there should be a red flag at the end of the cars undergoing repairs does not appear to have been known to the engineers engaged in running trains. It now appears that this was known to Donnelly, and to all the brakeman under him; and, as the accident was caused by the act of some of the persons under him who were engaged in moving cars, it is not apparent of what consequence it is whether other engineers knew of the rule or not. If the person who kicked the car against the cars where deceased was at work knew that a red flag indicated that repairers were at work, then it would seem that, if such flag had been in place, it would have been as good a notice as if it had blue, yellow, or any other color. The court further say, in its opinion, that the rule above cited of the defendant was "mainly, if not exclusively, intended for the government of moving trains." Moving trains were the very source of danger to these repairers. There would be no danger to the repairers from trains standing still. And it was for the purpose of stopping any moving trains that this red flag or the yellow flag or the blue flag was intended. Thus it appears in the rules that, in case of stoppage on the main track, the conductor must immediately station men with red flags. This is for the protection of the train which has stopped, and gives notice "that human life is in danger," if a train behind should come on. We do not see, therefore, how a signal which was intended for the government of moving trains by causing them to stop was not adapted to protect men who would be injured if the train did not stop.

We can hardly understand, from the opinion, that the court considered the color of the flag important, when that which was in use on this road was the well-known signal of danger. In the complaint there are numerous charges of negligence. The only one material on the evidence is that defendants were negligent in not maintaining suitable signals and watchmen to notify and warn the employes. We understand the opinion of the court to hold that, even if the red flag were a proper and suitable signal, yet, as there was no rule of the defendant requiring its use, and the flag was put up by the order of the yard-master, the defendant would be liable because the rule was not regularly promulgated by the defendant, although acted upon by the yard-master. Of course, whatever rules might be made, it would be impossible to prevent the risk that some person carelessly or maliciously might remove the flag required by the rules. The learned judge, however, who tried the case held that, if the yard-master had made rules that were sufficient, as explained by the court in the charge, it would be the same act as the act of the company. He therefore submitted to the jury the question whether the provision that a red flag should be posted at the end of the outermost car, where the men were at work, as a signal of danger, was a reasonably safe protection, provided it had been fairly observed. The jury must therefore have found that the red flag thus placed was not a reasonably safe protection; unless, however, they may have been influenced by another part of the charge, to which defendant excepted, and which is as follows: "You have a right to consider whether some rule which occurs to you, even though no company had adopted it, would have been a better rule, and given better protection, and such a one that ought to have been adopted and maintained." This part of the charge authorized the jury to consider, not simply whether the red flag was a reasonably safe protection, but, further, whether they could not think of some rule, never before known, which would have given a better protection, and which ought to have been adopted and maintained. Now, if the court had charged that, in case the jury could think of some better rule, then they could find the defendant negligent for not having adopted such rule, the charge would have been improper. But, taking the whole charge together, we think that this was not the meaning. The court had previously spoken of the rules of other companies, had said it was not the duty of defendant to adopt such rules; and, after making the remarks above quoted, the court added that, because some other company has adopted a rule, the jury could not hold, as a matter of right, that the defendants should have adopted it. Therefore it seems to us that the sentence excepted to did not have the objectionable meaning attributed to it by defendant. The whole matter was left to the jury to say whether the rules of the defendant afforded a reasonable and safe protection. This seems to be the question under the. decision of the court of appeals.

This accident happened in 1884. While it is in evidence that at that time the rules of the New York Central & Hudson River Railroad Company required the blue flag in such cases, it is also shown that at that time other companies used the red flag, as was done in this case; and one witness of experience had never heard of any other color being used prior to that time. As the evidence now stands, therefore, it appears that the red flag was at the time of the accident in general use, and the blue flag was exceptional; and, as has been already stated, the defendant's witness shows that the use of the red flag was the rule in that yard.

In regard to appliances, it has been said that the employer does not owe the duty of furnishing the best known or best conceivable, but only reasonably safe and suitable. *Burke* v. *Witherbee,* 98 N. Y. 562; *Probst* v. *Delamater,* 100 N. Y. 272, 3 N. E. Rep. 184. And the same rule must, in substance, apply here. It may be, however, that the decision of this present case in the court of appeals is to be construed (as claimed by plaintiff) as holding that

the rule requiring the use of the red flag was insufficient, and that the blue flag should have been used. If it were not for that, we should think that the proof was abundant that at the time of the accident the red flag might be used as a reasonably safe and sufficient protection, and that the accident would not have occurred if the rule and practice of the company, as established in that yard, had not been interfered with through the unauthorized removal of the red flag by some unknown person. We suppose that the plaintiff does not claim that the defendant is liable for the neglect of one of the repairers, charged with the duty, in not replacing the flag when his attention was called to the fact that it was lying on the ground. He was one of those whose duty it was to put the red flag in its place at the end of the crippled cars. We must notice that the proximate cause of the accident was the removal or the absence of the flag. If the red flag had been in place, and notwithstanding that the accident had happened, then some argument might have been made as to the sufficiency of the red flag, and the desirableness of a flag of some other color. But that was not the case, because the proximate cause was the absence of any flag at all. This cause came from the neglect of the train-repairer at the end of the train. He had notice that the flag was not in its place. He had been ordered by the foreman under whom he worked to keep the flag in the end of the train, and he neglected this duty. Even if there had been a positive rule promulgated by the company that the flag was only to be removed by the repairers, yet he was the repairer on whom this special duty was imposed; and, instead of putting the flag back in its place, he walked away with it towards some other part of the train; thus practically removing it himself. In the *Burke Case*, above cited, in which the court of appeals reversed the judgment when the jury had found the defendant guilty of negligence, some stress was laid in the opinion on the fact that the appliance had been in use in other places, and had never failed of its purpose; and the court say that it was inadmissible to impute negligence under such circumstances. In the present case we have a rule in general, though not universal, use, and no evidence is given that the rule has not always served the purpose, when obeyed, of warning those who were engaged in moving cars in such places to stop. If it accomplished this, it would seem to have been reasonably safe.

Some exceptions were taken by defendant to evidence given by plaintiff on cross-examination of one of defendant's witnesses. This evidence consisted of questions as to his opinion whether certain rules read by the counsel out of a book were good rules. That kind of examination was possibly admissible as tending to show the good or bad judgment of the witness. On the direct issue it was probably quite immaterial. But we do not think that its admission would justify a reversal of the judgment. It is undoubtedly true that the evidence as it now stands is different from that on the former trial. We think, however, that respect for the court of appeals should prevent us from taking any view which might be contrary to their decision, and we therefore leave it to that court to apply its former decision to the present state of the case. Judgment and order affirmed, with costs. All concur.